# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| JANE DOE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 1:20-cv-03641-JPB |
| | ) | Jury Trial Demanded |
| GWINNETT COUNTY SCHOOL | ) | |
| DISTRICT, JONATHAN SANKS, | ) | |
| and DOES 1-10, | ) | |
| | ) | |
| Defendants. | ) | |

---

**Jane Doe's Opposition to Gwinnett County School District's
Motion for Summary Judgment**

---

# TABLE OF CONTENTS

Overview ................................................................................................ 1

Statement of Facts ............................................................................... 3

Summary Judgment Standard.......................................................... 9

Argument ............................................................................................... 9

   a.  A reasonable jury could find that the District had actual notice
      that Sanks was a possible risk to Ms. Doe ........................................ 11

        i. The actual notice standard requires notice of "the
        possibility" of sexual misbehavior, not a signed
        confession.................................................................................. 11

        ii. A jury could find that the District had actual notice
        that Sanks presented a possible risk to Ms. Doe ..................... 13

   b.  A jury could find that the District was deliberately indifferent
      during and after the March 2015 investigation ................................. 19

      i.     The deliberate indifference standard ........................................ 19

      ii.    A jury could find deliberate indifference in the District's
          total deference to the result reached by an "inconclusive"
          criminal investigation............................................................... 21

      iii.   A jury could find deliberate indifference in the District's
          failure to offer supportive measures to Ms. Doe and
          inform her of her rights ............................................................ 30

          1.  The District failed to offer Ms. Doe any protective or
              supportive measures during or following the
              investigation ...................................................................... 30

          2.  The District never informed Ms. Doe of her Title IX
              rights ................................................................................... 36

3. The District misled Ms. Doe about her legal status
as a potential crime victim ................................................. 37

Conclusion ..................................................................................... 39

# TABLE OF AUTHORITIES

## Cases

*Baxter v. Palmigiano*,
  425 U.S. 308 (1976) .................................................................................. 17

*Bostic v. Smyrna School District*,
  No. 10261, 2004 U.S. Dist. LEXIS 2838 (D. Del.  Jan. 15, 2004).......... 17

*Brinkley v. Waters*,
  No. 2:18-CV-89, 2021 U.S. Dist. LEXIS 62402
  (S.D. Ga. Mar. 31, 2021) ......................................................................... 10

*Davis v. Monroe County Board of Education*,
  526 U.S. 629 (1999) .................................................................. 10, 12, 18

*Doe v. Bibb County School District*,
  688 F. App'x 791 (11th Cir. 2017).................................................... 21, 24

*Doe v. School Board of Broward County, Florida*,
  604 F.3d 1248 (11th Cir. 2010) ................. 9, 11-13, 19-20, 26, 30, 32, 35

*Doe v. District of Columbia*,
  215 F. Supp. 3d 62 (D.D.C. 2016)........................................................... 20

*Doe v. Fairfax County School Board*,
  1 F.4th 257 (4th Cir. 2021) ........................................ 12, 15, 35, 36, 39, 40

*Doe v. Forest Hills School District*,
  No. 1:13-cv-428, 2015 U.S. Dist. LEXIS 175321
  (W.D. Mich. Mar. 31, 2015)................................................. 13, 21, 26, 36

*Doe v. G-Star School of the Arts, Inc.*,
  2017 U.S. Dist. LEXIS 74235 (S.D. Fla. May 16, 2017)................. 15, 26

*Doe A v. Green*,
  298 F. Supp. 2d 1025 (D. Nev. 2004)...................................................... 15

*Doe v. Gwinnett County Public Schools*,
  No. 1:18-cv-05278-SCJ, 2019 U.S. Dist. LEXIS 238339
  (N.D. Ga. Aug. 22, 2019) ................................................................. 19, 33

*Doe v. Manor College*,
  479 F. Supp. 3d 151 (E.D. Pa. 2020).................................................. 27, 31

*Doe v. School Board of Miami-Dade County*,
  403 F. Supp. 3d 1241 (S.D. Fla. 2019).................................................... 26

*Franklin v. Gwinnett County Public Schools*,
  503 U.S. 60 (1992) ................................................................................ 10

*G.C. v. N. Clackamas School District*,
  654 F. Supp. 2d 1226 (D. Or. 2009) ....................................................... 27

*Gebser v. Lago Vista Independent School District*,
  524 U.S. 274 (1998) ...................................................................... 10, 23-24

*Hill v. Cundiff*,
  797 F.3d 948 (11th Cir. 2015) ............................................................... 10

*J.F.K. v. Troup County School District*,
  678 F.3d 1254 (11th Cir. 2012) ........................................................ 12, 18

*J.S. v. Houston County Board of Education*,
  877 F.3d 979 (11th Cir. 2017) ......................................................... 11, 21

*Karasek v. Regents of University of California*,
  956 F.3d 1093 (9th Cir. 2020) ................................................................ 23

*King v. Curtis*,
  No. 1:14-cv-403, 2016 U.S. Dist. LEXIS 184737
  (W.D. Mich. Nov. 1, 2016)........................................................................ 21

*S.B. v. Florida Agricultural & Mechanical University Board of Trustees*,
  No. 4:16cv613, 2019 U.S. Dist. LEXIS 234719
  (N.D. Fla. March 1, 2019) ....................................................................... 26

*S.C. v. Lansing Unified School District #469*,
   No. 18-2228-DDC-JPO, 2019 U.S. Dist. LEXIS 47859
   (D. Kan. Mar. 22, 2019) .......................................................... 20

*Stinson v. Maye*,
   824 F. App'x at 849 (11th Cir. 2020) ................................. 32, 36

*Tesoriero v. Syosset Central School District*,
   382 F. Supp. 2d 387 (E.D.N.Y. 2005) ................................... 13

*Williams v. Board of Regents of the University System of Georgia*,
   477 F.3d 1282 (11th Cir. 2007) ............................................. 34

Statutes

85 Fed. Reg. 30099 ....................................................................... 23

Regulatory Items

U.S. Department of Education, Office of Civil Rights, Revised Sexual
   Harassment Guidance (Jan. 2001) at 21 ................................. 22

U.S. Department of Education, Office of Civil Rights, Dear Colleague
   Letter (April 4, 2011) at 10 .................................................... 22

U.S. Department of Education, Nondiscrimination on the Basis of Sex
   in Education Programs or Activities Receiving Federal
   Financial Assistance, 85 Fed. Reg. 30099 (May 19, 2020).................... 22

**Overview**

This case arises from a predatory "relationship" between a popular high school football coach and a girl he recruited as a freshman to serve as a "football manager," then groomed to be his sexual victim for years. The present question is whether the District can be liable for what its officials did after discovering Sanks and Ms. Doe in his locked, dark, private office in a secluded campus building.

The District's subsequent investigation turned up damning facts—most of which will be news to the Court, since the District omitted them from its brief. Both Sanks and the girl gave shifting explanations that District officials believed were lies. The girl destroyed her text messages with Sanks. And when the police told Sanks that he was lying about not seeing Ms. Doe naked, he took the Fifth.

But rather than protecting the student and deterring Sanks, the District falsely told Ms. Doe she could not be a victim because she was old enough to consent, quietly ended the investigation, brought Sanks back to school, and never said another word to Ms. Doe about the affair. Sanks shifted where he abused Ms. Doe from his office to his truck. Then, when Ms. Doe's mother sought the principal's help because other students were attacking Ms. Doe for being a "slut," he did nothing to help her. That is what a series of Title IX violations looks like.

1

The District's arguments for summary judgment are flawed. The District denies having actual notice of the possibility that Sanks was a risk to Ms. Doe, but only by omitting the facts of what it knew. The District's deliberate indifference argument boils down to the position that because it did some investigation and decided things were "inconclusive," it cannot be liable as a matter of law. The Eleventh Circuit and many other courts have rejected that minimalist theory of Title IX compliance. The details matter, and the details here show that the District did not conduct a Title IX investigation—the District's officials did not know how to. Instead, they deferred entirely to the outcome of the criminal investigation, which the courts and the Department of Education forbid because of the differences between criminal and civil process. The District admittedly lied to Ms. Doe about her status as a victim, told Ms. Doe she was in trouble, and withheld some of its internal concerns while failing to offer her the supportive measures Title IX requires. Then, when the District gave up because Coach Sanks took the Fifth, the District left Ms. Doe exposed—even after her mother pleaded for help— while other students attacked her and Coach Sanks kept abusing her. That is indifference to Title IX.

The Court should deny summary judgment.

### Statement of Facts

Ms. Doe will present a somewhat abbreviated statement of facts in the interest of economy because the legal analysis below is so fact-bound. Briefly, Ms. Doe was a student at Berkmar High School in Gwinnett County from 2011–2015. During her freshman year, Sanks recruited her to become a "football manager," a standardless position in which Sanks had her work as much as forty hours a week during the season and sixty during the summer. Sanks Dep. 10:11–18; 12:1–4; 42:5–7; Doe Dep. 125:18–126:6. The job gave Sanks access to Ms. Doe in off-hours, unsupervised settings; in addition to mundane tasks like filling water bottles, Sanks liked to have Ms. Doe iron his pants while he sat in his shorts watching TV in his private office. Doe Dep. 48:7–19; 40:15–42:2. Sanks used the privacy of his office, which had a lock on the door and where he kept a couch, to gradually manipulate and coerce Ms. Doe into engaging in sexual activity with him. Doe 2021 DA Interview 19:3-15, 23:2-23. She was frequently scared when Sanks pursued her sexually. *Id.* at 24:9-23, 26:8-9, and 44:22-23. Their sexual interactions were sometimes forcible by him and often painful for her. *E.g.*, *id.* at 42:1-10, 57:11-20.

On March 24, 2015, a Berkmar security officer and a teacher surprised Sanks and Ms. Doe in his private office; the security officer summarized the scene:

----- Forwarded by Martha Finnegan/Berkmar High/GCPS on 03/25/2015 01:00 PM -----

From:        "Detective J. E. Barker" <detectivejebarker@gmail.com>
To:          kelly_walters@gwinnett.k12.ga.us, martha_finnegan@gwinnett.k12.ga.us
Cc:          george_zaun@gwinnett.k12.ga.us
Date:        03/25/2015 12:49 PM
Subject:     Unit-4;Officer Barker's statement

3/25/2015 Statement by security officer Jason Barker,employed at Berkmar high school, licensed through the Georgia Secretary of State's office in security and private investigations.
Event date:Tuesday, 24 March 2015.
While moving students past the orange cones in the bus lanes with Mr. Brinyark. I was questioning a student about the name of another student from an earlier and separate incident. The student informed us he had the subject and his six period weightlifting class which was taught by coach Sanks,in the Fieldhouse. Realizing that coach Sanks was probably still on campus I asked Eddie Brinyark if he would like to join me in asking Coach Sanks to identify the subject.
We then went to the Fieldhouse, somewhere in the timeframe of 1615 hrs. and 1625 hrs. Upon arriving we noted the front door of the Fieldhouse propped open with a trashcan,so we let ourselves in. We walked down the main hallway to the back hallway. I noting no sound or anyone inside that we could see or hear. We then took a right headed toward the weight room. While walking I could see the lights on in both locker rooms,the main office door locked as I tried to open it. I looked in and the lights were out in the office. We continue to the weight room. Verifying nobody in the weight room,we turned to leave the building. I check the office door once more and verifying it was locked, we walked down to the main hallway as we were about to turn the corner the door opened. Coach Sanks stuck his head out to greet us. I walked back over to him showing him if he could identify the student picture on my phone. We stood outside his door for a moment while he looked at the picture. Coach Sanks said he recognized the student,that he was new and couldn't remember his name. He said he had it on his list of students. While walking into his main office I noted a sound and what looked to be the back of a female student exiting the side door and no one else in the office that I could see. That along with Coach Sanks quick speech and strange,forward upper body posture, caused me to take note.
After obtaining the subject's name. Mr. Brinyark and I left the office. As I turned the corner,waiting for Mr. Brinyark, I held up 2 fingers stating this was the second time something like this had happened with Coach Sanks.
So I, along with Mr. Brinyark, returned to the main school office to I'm for someone in Administration. I located Mr. George Zaun. And informed him of the situation.

GCSD-000461.[1]

That report prompted Principal Al Taylor to ask his deputies to look into the "concern[ing]" matter.[2] Police Report, GCSD-000455. Assistant Principal ("AP") Martha Finnegan began the inquiry by pulling Ms. Doe out of the lunchroom and telling her "You are in trouble; come with me." Doe Dep. 58:4–59:7. While

---

[1] The District has tried to minimize this incident by arguing that Sanks only had Ms. Doe in his office for approximately three and a half minutes. [Doc. 86-29 at 11]. That is more than enough time to begin a sex act, as Ms. Doe testified was happening. Doe 2021 DA Interview 30:4–20.
[2] In his email elevating the incident to Principal Taylor, Assistant Principal George Zaun said that after reviewing the security footage, he "really felt uneasy about this situation." GCSD-038075.

4

speaking with AP Finnegan and another AP, Kelly Walter, Ms. Doe initially

denied being in Sanks's office at all. Walter Aff. att. 5, Doe Dec. ¶ 7. After they

confronted her with video evidence that she had been in his office, Ms. Doe said

she was there to retrieve a phone charger, but she denied anything inappropriate

occurred. *Id.* The APs did not believe her; they suspected a "sexual situation" and

thought her denials were "not honest." GCSD-038011–12; Doe 2015 Interview

7:12–16. Ms. Doe informed Finnegan and Walter that Sanks was texting her during

her interview, but the officials did not ask to see the text messages. Sanks was

texting Ms. Doe to destroy her texts to protect him, which she did. GCSD-038011–

12; Doe Dep. 67:11–17; 128:24–130:2.

　　While speaking with Finnegan and Walters, and during an interview with

Special Resource Officer Penn,[3] Ms. Doe volunteered questions along the lines of,

"So say if me and him had sex . . . ?," which District officials found concerning.

Doe 2015 Interview at 36:24-25. But SRO Penn never directly asked Ms. Doe if

she was having sex with Sanks. Penn Dep. 26:5–27:18. Nor did SRO Penn tell Ms.

Doe there would be help for her if she was a victim. *Id*. Instead, SRO Penn lied and

told Ms. Doe, "You're 17. You are able to consent to sexual activity" with Sanks,

---

[3] SROs are police who are employed directly by Gwinnett County School District, but who have traditional law enforcement powers and duties.

and that who she had sex with was her private "business." Doe 2015 Interview 35:21–37:11; 37:24–38:4.[4]

Ms. Doe's mother, who trusted Sanks as a family friend because he spent years currying her favor to disguise his intentions with her daughter, was initially skeptical, but when the police shared the facts with her, she became openly concerned—she said the situation "looks suspicious" and that if Sanks was "crossing the line," it would be "a deadly mistake." Doe Interview 64:6–65:16; 70:9–19. Ms. Doe's mother left that interview by saying "God bless you . . . I'm happy you guys are working on this." Doe Interview 72:10–16.

SRO Penn and SRO Joe Barnes then confronted Sanks with the facts: being in a locked, dark office was suspicious. Sanks Interview 7:23–2. The student asking "what if" questions was concerning. *Id*. at 8:15–9:7. Destroying her texts with Sanks was even worse. *Id*. at 10:1–14:7. SRO Barnes asked Sanks if he had ever seen Ms. Doe naked, and when he denied it, Barnes told him "You're not being honest" and threatened to subpoena Ms. Doe's cell phone carrier for her texts. *Id*. at 14:14–16:7 At which point Sanks invoked his right to counsel. *Id*. at

---

[4] SRO Penn, who now acknowledges that her untrue statements could have hurt Ms. Doe and could have impacted her ability to come forward as a victim, defends her deception as a ruse designed to encourage Ms. Doe to acknowledge the abuse. Penn Dep. 23:7–29:1; 56:8–57:22. Regardless of whether a jury accepts that explanation, neither SRO Penn nor anyone else from the District corrected those false statements after the investigation and told her that she could in fact be a victim. Penn Dep. 21:21–24.

17:13–17. The investigation all but ended there. Even though District officials did not believe the denials, the police felt there was "nowhere to go from a criminal perspective." Barnes Dep. 63:21–64:9.

District Director of Human Resources, Derrick Williams, was supposed to be conducting his own investigation from an HR or "employee facing, not student facing" perspective. Williams Dep. 46:22–47:2; 20:6–19; 23:24–10. In doing so he just "relied on the results of the actual police investigation" because District policy forbade him from "second guess[ing] the police." Williams Dep. 62:14–66:7. He never even reviewed the police reports or interviews. Williams Dep. 62:14–66:10. Williams interviewed Sanks but kept only two sentences of notes that "Sanks denied the allegation" and that he had Ms. Doe in his office to talk about "how she should communicate with her mother." Williams Dep. 49:5–51:9. He did not speak with Ms. Doe or consider it his role to interact with Ms. Doe or ensure that she was aware of her Title IX rights. Williams Dep. 51:19–23.

By coincidence, the day Sanks and Ms. Doe were caught in the coach's office, Principal Taylor received an email from an Associate Superintendent, ordering him that sexual misconduct "**MUST** be investigated by the designated Title IX Coordinator" (as federal law required). GCSD–038107–08 (all emphases in original); Taylor Dep. 91:24–93:23. Among other reasons, that is because Title

IX requires schools to investigate possible teacher-on-student misconduct independently of the criminal system, and to support and protect students during and after investigations so that they can continue to learn at school. Spraggs Dep. 18:23–20:22; 40:20–42:1.[5] Yet Principal Taylor declined to inform the Title IX coordinator because he did not view this to be a Title IX problem without "an incident of witnessing, you know, touching or kissing . . . or a text, you know, or E-mail." Taylor Dep. 94:22–96:6. In Principal Taylor's view, "[t]his right here was just an employee investigation," not a Title IX investigation in which Ms. Doe had rights and interests of her own. Taylor Dep. 140:19–141:4.

Perhaps that is why the District failed to inform Ms. Doe of the investigation's "conclusion," failed to offer her any supportive measures, failed to tell her that she had the right to pursue criminal charges (after lying to her and telling her she could *not* be a crime victim), and failed to tell Sanks not to have contact—much less sex—with Ms. Doe. Doe Dec. ¶¶ 16-19; Taylor Dep. 80:13–16; 83:13–21; 140:19–141:4; Penn Dep. 21:5–16. Sanks did not stop; other students began attacking Ms. Doe, and employees shunned her. Doe Dep. 80:17–20; 83:22–84:5; 125:9–17; 127:9–17, Doe Dec. ¶¶ 12, 13, 20. District officials were warned about the student harassment but did nothing to stop that either.

---

[5] Joyce Spraggs was the District's system-wide Title IX Coordinator and 30(b)(6) witness.

Taylor Dep. 87:24–88:19; Doe Dec. ¶ 18; Johnson Dec. ¶¶ 17-19 . The following year they transferred Sanks to a different school in the District. Taylor Dep. 141:18-21.

## Summary Judgment Standard

Under Title IX, the summary judgment question is whether, "[v]iewing the facts in the light most favorable to Doe," the "jury, as a matter of law, could *not* find that" the defendant school district responded with deliberate indifference to actual notice of the "risk of a Title IX plaintiffs' sexual harassment." *Doe v. Broward Cnty.*, 604 F.3d 1248, 1258–59 (11th Cir. 2010). The familiar standard for reviewing the record applies, *see id.*, contrary to the District's argument that the Court can weigh conflicting evidence and make credibility determinations to resolve the many disputed issues of material fact in this case [Doc. 86-29 at 5; 20].[6]

## Argument

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial

---

[6] With respect to substantive claims against the District, Ms. Doe is electing to proceed on her Title IX claims (Counts 1 and 2), which will, *inter alia*, mitigate any concerns about duplicative damages for roughly parallel constitutional claims. She thus does not object to the dismissal of Counts 3, 4, and 6 against the District.

assistance." 20 U.S.C. § 1681(a). The Supreme Court has long allowed private suits "to vindicate" Title IX against school districts who act with deliberate indifference to the risk that their teachers are sexually abusing their students. *See Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60, 75–76 (1992); *accord Davis v. Monroe Cnty. Bd. of Ed.*, 526 U.S. 629 (1999); *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274 (1998).

This case presents a paradigmatic Title IX violation: high-level school district officials knew that a teacher was possibly having sex with a student, and yet failed to protect the student or deter her abuser, because, a jury could find, they were indifferent to the student's rights under Title IX. "The standard for liability in Title IX cases is far less rigorous in cases involving teacher-on-student sexual harassment than those involving student-on-student sexual harassment." *Brinkley v. Waters*, No. 2:18-CV-89, 2021 U.S. Dist. LEXIS 62402, at *17-18 (S.D. Ga. Mar. 31, 2021) (citing *Hill v. Cundiff*, 797 F.3d 948, 968 (11th Cir. 2015)). The reason is that some degree of misbehavior between students is inevitable, *Davis*, 526 U.S. at 651–52 (1999), but the law expects more of adults: there is no tolerable level of employee-on-student sexual misconduct, Spraggs Dep. 128:1–3.

In the teacher-on-student context, Ms. Doe has the burden to establish that an "appropriate person"— *i.e.*, someone with the power to remedy the abuse—had

"actual notice" of "the possibility of the Title IX plaintiff's harassment" and "the official with such notice [] exhibit[ed] deliberate indifference to the harassment." *Broward Cnty.*, 604 F.3d at 1254. Ms. Doe has established a genuine issue of material fact as to each of the disputed elements: (1) actual notice of the possibility of sexual harassment and (2) deliberate indifference to the possibility.[7]

### a. A reasonable jury could find that the District had actual notice that Sanks was a possible risk to Ms. Doe.

#### i. The actual notice standard requires notice of "the possibility" of sexual misbehavior, not a signed confession.

In the teacher-on-student context, the question is whether an appropriate person had "actual notice" sufficient "to alert [that person] to the *possibility* of

---

[7] The District admits that it has received millions of dollars in federal funding and is subject to Title IX. District's Answer at ¶ 14 [Doc. 23]. The District also appears to acknowledge that multiple individuals who undisputedly had notice of the March 24, 2015 incident and subsequent investigation would be "appropriate persons" for purposes of the Title IX actual notice inquiry. The "fact-based" definition of an "appropriate person" is an official who could "initiate corrective action" or place "other restrictions" on an offending teacher in response to a sexual harassment complaint. *Broward Cnty.*, 604 F.3d at 1255–56; *see also J.S. v. Houston Cnty. Bd. of Ed.*, 877 F.3d 979, 989 (11th Cir. 2017) (school officials, even teachers, with "some supervisory authority" over the abuser can be responsible officials). Principal Al Taylor qualifies, and Assistant Principals Finnegan and Walter likewise were "high enough on the chain-of-command." *See id.*; *compare* Doc. 82-2 ¶¶ 18; 23 (acknowledging that "Sanks was supervised by the assistant principals and principal"). District-level Human Resources Director Derrick Williams was in a role the Board specifically empowered to handle employee-on-student abuse. Williams Dep. 15:9–25. And, as explained below, a jury could find that Taylor and Williams effectively "delegated [their] powers" to School Resources Officers Barnes and Penn. *See Bostic v. Smyrna Sch. Dist.*, No. 10261, 2004 U.S. Dist. LEXIS 2838, *12 (D. Del. 2004) (higher-level officials may delegate their powers, and thus their status for actual notice purpose, to other school officials).

Doe's sexual assault." *Broward Cnty.*, 604 F.3d at 1258 (emphasis added); *see also*

*J.F.K. v. Troup Cnty. Sch. Dist.*, 678 F.3d 1254, 1256 (11th Cir. 2012).

The actual notice standard—possibility, not proof beyond a reasonable

doubt—is keyed to its purpose. Actual notice simply "triggers [a district's] duty to

investigate." *Doe v. Fairfax Cnty.*, 1 F.4th 257, 268 (4th Cir. 2021) (citing *Davis*,

526 U.S. at 649–50)). As such, the "actual notice standard does not set the bar so

high that a school district is not put on notice until it receives a clearly credible

report of sexual abuse from the plaintiff-student." *Broward Cnty.*, 604 F.3d at

1257.

A district's actual notice is iterative, as are the district's obligations in

response. The "known circumstances" giving rise to actual notice of possible

abuse, and therefore requiring a response, can "change[] significantly" as the

district learns facts. *Broward Cnty.*, 604 F.3d at 1261. Circumstances that at first

seem merely questionable may become increasingly suggestive as an inquiry

proceeds. *Id.*; *Baynard v. Malone*, 268 F.3d 228, 236 (4th Cir. 2001) (schools must

consider "mounting evidence of potential misconduct").

The District appears to be urging an actual notice standard requiring an

admission of wrongdoing at the outset, but the courts have rejected schools'

attempts to cast the "actual notice" standard as requiring unambiguous

12

confirmation before the District must even help the student and deter the possible risk. *E.g.*, *Broward Cnty.*, 604 F.3d at 1257–58 (explaining that the standard is focused on risk, because it is the "risk of [sexual misconduct] that the Title IX recipient has the duty to deter"); *see also, e.g.*, *Doe v. Forest Hills Sch. Dist.*, No. 1:13-cv-428, 2015 U.S. Dist. LEXIS 175321, at *34 (W.D. Mich. Mar. 31, 2015) ("A signed confession or video tape of the alleged assault or the subsequent harassment" is not required).

Except in the clearest cases, whether a school official had actual notice of the possibility of sexual harassment is a jury question. *See Broward Cnty.*, 604 F.3d at 1259; *Tesoriero v. Syosset Cent. Sch. Dist.*, 382 F. Supp. 2d 387, 397 (E.D.N.Y. 2005) ("Whether complaints 'unsubstantiated by corroborating evidence and denied by the allegedly offending teacher' did or should have put a school district on notice of a teacher's substantial risk to students 'is usually a question for the jury.'").

### ii. A jury could find that the District had actual notice that Sanks presented a possible risk to Ms. Doe.

The District's denial of actual notice is inconsistent with the record and the behavior and beliefs of the District employees who investigated Sanks in 2015. We can begin with the following record of Principal Taylor's contemporaneous views. When he learned that Sanks had a female teenage student alone after school in a

13

locked, dark office in a secluded building, that the girl fled when she and Sanks were discovered by security officers, and that she subsequently gave inconsistent accounts of why she was in the locked, dark office – he contacted the school police and told them he was "*concerned that something inappropriate occurred*." Police Report, GCSD-000455 (emphasis added). [8] Based on Principal Taylor's report, SRO Barnes opened an investigation into the incident type "Crime Against a Child." *Id.*

Principal Taylor also contacted Director of Human Resources Derrick Williams to begin an HR investigation and directed APs Finnegan and Walter to report the matter to DFACS and interview Ms. Doe. Taylor Dep. 131:17–132:2; 80:22–25. According to the contemporaneous records, those interviews heightened officials' concerns. When Ms. Doe was first interviewed by Finnegan and Walter, she did not report that she went to Sanks's private office until she was shown security video disproving her story, prompting a second interview and a second written statement. Aff. of Kelly Walter ¶ 16; att. 5; Doe Dec. ¶ 9.

---

[8] Principal Taylor already had reason to be concerned about Sanks. He was aware of rumors the previous year that Sanks was having an inappropriate relationship with a student, and that his name surfaced during an investigation into whether that student was being sexually abused by a teacher. GCSD-032901; Taylor Dep. 40:2-6; 41:14-25. The District determined that Sanks was not the teacher who was abusing the other student, but did nothing else at the time to investigate the rumors about Sanks. Taylor Dep. 42:7-19.

Principal Taylor subsequently emailed APs Finnegan and Walter to catalogue the "inconsistencies in [Ms. Doe's] stories." GCSD-038093. Ms. Walter wrote, *inter alia*, the following:

- "The student's immediate reaction when the interview started was to make sure Sanks was not going to get in trouble. At that point in [the] interview we were just asking what she had done the day before prior to her game."

- "The student was not honest until the second meeting that she did go into Coach Sank's [sic] private office."

- "The student was not honest and did not provide [an] explanation for which door she used to exit the field house."

- "The student was not forthcoming with why she went into the field house with her jacket on and ran out without it on."

- "When I asked her to hold her phone unprompted she told me that Sanks had just texted her asking where she was."

GCSD-038011–12.

APs Finnegan and Walter told Ms. Doe herself that "they think it could be a sexual situation. They said it looks suspicious."[9] Doe 2015 Interview 7:12–16.[10]

---

[9] Ms. Walter's name is misspelled as Rogers in the transcript.

[10] The District appears to insist that Ms. Doe's "denials" establish as a matter of law that it did not have actual notice, but there are at least two flaws with that argument. First, based on their own statements, a jury could find that District officials did not actually believe those denials. Second, courts have rejected the District's view of the actual notice standard, which would privilege manipulative pedophiles over students. *Fairfax Cnty.*, 1. F.4th at 267 (allowing schools to evade Title IX liability anytime a student denies sexual abuse would create "perverse incentives" and be "especially concerning as applied to children, who cannot be expected to articulate the sexual abuse and harassment they suffer in the same words as adults."); *G-Star Sch.*

More concerning evidence came to light during Ms. Doe's interview with SRO Penn. Unprompted, Ms. Doe asked "So say if me and him had sex, what would that violation be?" Doe 2015 Interview 36:24-25. To which SRO Penn responded that, since Ms. Doe was 17 and if she didn't resist, "I don't know that I have an issue." *Id.* at 37:1-5. SRO Penn insisted, "You're 17. You are able to consent to sexual activity" with Sanks. *Id.* at 35:21–37:11. Despite what she told Ms. Doe, SRO Penn was "concerned" by Ms. Doe's what-if questions. *Id.* at 68:19–69:1.

> Shortly thereafter, the other SRO, Officer Barnes, confronted Sanks:
>
> All right. So why, why in a million years, when Officer Penn wants to ask her what's going on, would she say 'If I – if I tell you we had sex off campus, what's gonna happen to him? . . . [SRO Penn] never asked her about sex, Jonathan. . . . So that's – that's not a normal question, Jonathan.

Sanks 2015 Interview at 8:15-9:23.

SRO Barnes pressed Sanks on whether he had "ever seen [Ms. Doe] without her clothes on," and whether he had "ever touched her." *Id.* at 14:14–24. Sanks denied doing anything other than hugging Ms. Doe, but he "showed signs of

---

*of the Arts, Inc.*, No. 16-cv-80466, 2017 U.S. Dist. LEXIS 74235, *22 (S.D. Fla. May 16, 2016); *Doe A v. Green*, 298 F. Supp. 2d 1025, 1034 (D. Nev. 2004). This is especially true where, as here, the student testified that the way the District questioned her made it more difficult for her to come forward.

deception and appeared to become nervous." GCSD-000456. SRO Barnes told

Sanks, "Jonathan, you and I have known each other a while, and you're, you're not

being honest with me." Sanks 2015 Interview at 15:3-16:7.

Prior to the Sanks interview, SRO Barnes had sent another SRO to conduct a

consent search to "check [Ms. Doe's] phone for evidence of an inappropriate

relationship." Barnes Dep. 82:19–24.[11] But the officer discovered that, apparently

after Ms. Doe was interviewed, "Ms. Doe had deleted all text messages sent

between her and offender. Other text messages to different parties had not been

deleted." Police Report GCSD-000456.

SRO Barnes was concerned by the deleted text messages and told Sanks,

"This, this ain't looking good at all." Sanks 2015 Interview at 11:15-20. When

Barnes gave Sanks another chance to to "be honest and forthcoming" because it

might help him with the prosecutors, Sanks "ended the interview by saying he

wanted to talk to [the police] more but only after speaking to an attorney." *Id.* at

---

[11]The District was aware that Ms. Doe and Sanks exchanged text messages, including text messages that he sent her during her initial interview with the APs the day after the incident. Aff. of Kelly Walter at Ex. 5 ("When I asked to hold her phone unprompted she told me that Sanks had just texted her asking where she was."). Ms. Doe testified that Sanks was texting her to instruct her to delete all of her messages with him and not disclose the sexual abuse. Doe Dep. at 64:16-21; 67:11-17. District policy would have allowed APs Finnegan and Walter to search Ms. Doe's phone, but for some reason (that the District has not offered) they declined to do so. *See* GCSD Policy K-Students, Interrogations & Searches, GCSD-022132-33.

16:12–17:17; Police Report GCSD-000456. Although inadmissible in a criminal trial, invocation of the Fifth Amendment can be civil evidence of wrongdoing and should have enhanced the concern. *Baxter v. Palmigiano*, 425 U.S. 308, 317 (1976).

A jury considering that evidence could conclude that District officials had actual notice of the need to investigate, if not remediate, the situation before them.

The evidence in this case roughly parallels but exceeds that in *Doe v. G-Star School of the Arts*, in which another district court in this circuit sent a question of actual notice to trial. There, the teacher allegedly "groomed" the student over years and developed a sexual "relationship" with her. No. 16-cv-80466, 2017 U.S. Dist. LEXIS 74235, *2 (S.D. Fla. May 16, 2016). During an investigation, the teacher and student denied any misconduct, and the student's father did not express concern. Nonetheless, other evidence of abuse—namely, reports from other students—created a material issue of fact about whether the district had actual notice of the risk of abuse. *Id*., *23. The facts here are even more concerning.

The District's argument against actual notice depends on omitting most of the record, which distinguishes this case from those the District cites. In *J.F.K. v. Troup County*, the offending teacher and student-victim were known to be overly familiar, but when confronted the teacher "always provided a plausible

explanation" rather than invoking the Fifth Amendment. 678 F.3d at 1258. And there were no deleted text messages, no "what-if-we're-having-sex" questions from the victim, no denials by both victim and predator that school officials disbelieved, and so on. The record was even thinner in *Davis v. Dekalb County*: the teacher had "incidental[ly]" touched another student's behind while playing touch football during P.E. and had tried to touch her at a water fountain but did not actually make contact with her. 233 F.3d 1367, 1373 (11th Cir. 2000).

District decision-makers had every reason to confront the possibility that Sanks was sexually abusing Ms. Doe based on the known circumstances they learned. But, as explained below, a jury could find that District officials refused to deal with the facts, which exposed Ms. Doe to further harm.

### b. A jury could find that the District was deliberately indifferent during and after the March 2015 investigation.

#### i. The deliberate indifference standard.

In addition to actual notice, Ms. Doe must also raise a jury question as to whether the District was "deliberately indifferent" to the possibility that she was being sexually harassed or abused. *Broward Cnty.*, 604 F.3d at 1259. A school is deliberately indifferent if its "response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Id.*

Deliberate indifference is a fact-bound question about the District's "action and inaction," in which all the "events and circumstances must be considered cumulatively." *Hill*, 797 F.3d at 975; *see also Doe v. Gwinnett Cnty. Pub. Schs.*, No. 1:18-cv-05278-SCJ, 2019 U.S. Dist. LEXIS 238339, *23 (N.D. Ga. Aug. 22, 2019) (rejecting the District's attempt to atomize "each individual component of its alleged, overall deliberate indifference," which "flies in the face of the notion that all events and circumstances must be considered 'cumulatively.'").

At summary judgment, the question is not whether the Court finds the District's conduct reasonable, but whether "a jury, as a matter of law, could not find that [the District's] response . . . was clearly unreasonable under the known circumstances." *Broward Cnty.*, 604 F.3d at 1259. The deliberate indifference "inquiry, like any state-of-mind determination, is ultimately fact-bound and dependent on both witness credibility and those inferences that a jury can reasonably draw from the relevant circumstances. It is therefore ill-suited for summary judgment in all but the clearest of cases." *Doe v. District of Columbia*, 215 F. Supp. 3d 62, 77 (D.D.C. 2016) (rejecting summary judgment in analogous § 1983 deliberate indifference case); *see also S.C. v. Lansing Unified Sch. Dist.* #469, No. 18-2228-DDC-JPO, 2019 U.S. Dist. LEXIS 47859, at *20 (D. Kan. Mar. 22, 2019) (similar under Title IX). The Eleventh Circuit's deliberate indifference

20

cases reflect that fact-sensitive approach. *See, e.g.*, *Broward Cnty.*, 604 F.3d at

1261 (exploring how "the reasonableness of a School Board's response changed

significantly" as the facts evolved); *J.S.*, 877 F.3d at 990–991 (sifting through the

deposition testimony to evaluate the knowledge and actions of district personnel).[12]

Although the evidence must be viewed "cumulatively," *Hill*, 797 F.3d at 975, Ms.

Doe will organize the facts in several groupings below.

> ### ii. A jury could find deliberate indifference in the District's total deference to the result reached by an "inconclusive" criminal investigation.

The evidence supports a finding that the District outsourced its decision-

making to a criminal investigation, which is contrary to Title IX. A reasonable jury

could interpret that to be "a repudiation of [the District's] obligations under Title

IX to protect students from sexual harassment and discrimination and, therefore,

[such deference may] constitute evidence of deliberate indifference." *King v.

Curtis*, No. 1:14-cv-403, 2016 U.S. Dist. LEXIS 184737, at *26-27 (W.D. Mich.

Nov. 1, 2016); *see also Forest Hills*, 2015 U.S. Dist. LEXIS 175321, at *17

(same); *cf. Doe v. Bibb Cnty. Sch. Dist.*, 688 F. App'x 791, 797–98 (11th Cir.

2017) (finding school's transfer of investigation to the police to be "not clearly

---

[12] *J.S. v. Houston County* was a Title II case, but the courts "borrow" back and forth between Title II and Title IX. *See* 877 F.3d at 992.

unreasonable" only where "both parties agree that the original investigation conducted by the [school] was adequate and thorough"). The District's Title IX Coordinator and corporate representative admitted as much in her deposition (and in internal presentations): a "police investigation cannot substitute for a thorough Title IX investigation." Spraggs 70:4–71:17, 78:16–21 ("It's very important" to honor that principle).

And as the District's own "Title IX expert" wrote—in the rare case in which he worked for a student-victim—"[w]hen schools . . . rely largely or wholly on law enforcement investigations, the school acts unreasonably in light of the known circumstances, and contrary to well-established guidance from the US Department of Education, which courts generally respect as persuasive authority. The result is a failure to stop the harassment, prevent its recurrence, and [provide a] remedy for the victim and the community at-large. Failure in any or all of these requirements falls below the standard of care and can constitute deliberate indifference." Brett A. Sokolow, Expert Report, *L.E. v. Lakeland Joint Sch. Dist.* p. 18 (Nov. 1, 2018).

The reason, as the Department of Education has emphasized for at least two decades, is that "legal standards for criminal investigations are different, [so] police investigations or reports may not be determinative of whether harassment occurred under Title IX and do not relive the school of its duty to respond

promptly and effectively." U.S. Dep't of Ed. Office of Civil Rights, Revised

Sexual Harassment Guidance (Jan. 2001) at 21; *accord* U.S. Dep't of Ed. Office of

Civil Rights, Dear Colleague Letter (April 4, 2011) at 10 ("Conduct may constitute

unlawful sexual harassment under Title IX even if the police do not have sufficient

evidence of a criminal violation."); Department of Education, Nondiscrimination

on the Basis of Sex in Education Programs or Activities Receiving Federal

Financial Assistance, 85 Fed. Reg. 30099 (May 19, 2020) (explaining that "a

recipient cannot discharge its legal obligation to provide education . . . free from

sex discrimination by referring Title IX sexual harassment allegations to law

enforcement . . . because the purpose of law enforcement differs" and "the

recipient's obligation is to respond supportively . . . and provide remedies where

appropriate" regardless of criminal matters). [13]

The District's claim that it can entirely disregard the Department of

Education's views, Doc. 82-29 at 14, sweeps too broadly. The *Gebser* Court

explained that a failure to implement the regulatorily-required grievance and

notification procedures did not *per se* establish deliberate indifference, 524 U.S. at

---

[13] In 2017, the 2001 and 2011 OCR guidance documents were formally withdrawn in favor of notice-and-comment rulemaking, but the principle that schools may not defer Title IX investigatory decision-making to the police held firm and has been constant across every administration from Clinton to Bush to Obama to Trump to Biden. *See* 85 Fed. Reg. 30099.

291–92, but since then the courts have recognized that willful defiance of regulatory standards is also not "entirely irrelevant to the deliberate-indifference inquiry." *Karasek v. Regents of Univ. of Cal.*, 956 F.3d 1093, 1108 (9th Cir. 2020) (Bybee, J.). The courts have generally recognized that whether districts try to align their conduct with the Department of Education's "persuasive" expectations "may guide the analysis," particularly where the non-compliance "reflects an official decision not to remedy the Title IX violation." *Id.* (quoting *Gebser*; cleaned up). The District's corporate representative and "Title IX expert" share that understanding. Spraggs Dep. 78:7–10 ("[Y]ou comply with the standards in the Dear Colleague letter and the guidance that exists at the moment you're acting; right? A. Correct."); *accord* Sokolow *Lakeland* opinion, *supra* (opining that deferring to a criminal investigation constitutes deliberate indifference).[14]

Based on the testimony of Derrick Williams, a jury could find that the District simply "relied on the results of the actual police investigation" because District policy would not allow Williams to "second guess the police." Williams

---

[14] The District Court decision in *Doe v. Bibb County School District*, 83 F. Supp. 3d 1300, 1304 (M.D. Ga. 2015), held that evidence of "alleged noncompliance with" regulations "cannot be a basis for a Title IX claim," but the District's broad reading of that statement is out of step with the case law generally, which (quite sensibly) recognizes that systematic deviations from regulations can reflect a district's state of mind toward Title IX compliance. The Eleventh Circuit's *Bibb County* decision did not consider that issue. *See* 688 F. App'x 791, 797 n.5 (11th Cir. 2017) (affirming summary judgment solely on actual notice grounds).

Dep. 62:14–66:7.[15] Once the police "are involved, that's what their responsibility

is, to conduct the investigation" and to "see if this was a criminal action." *Id*. Upon

police involvement, "our process was just to step back . . . ." Williams Dep. 69:8-

10. Any action that Williams would take related to whether a teacher was sexually

abusing a student would be determined not by him, but by whether "the policeman

said that there was a violation." *Id.* 69:22-70:9.

The police confirmed that they were not conducting a Title IX investigation.

Barnes Dep. 19:9-21 ("I am not a Title IX investigator. I was there for the criminal

perspective."); *id*. at 20–1-7 ("Q. In March of 2015, would you have known how to

conduct a Title IX investigation? A. No.").

The District cannot argue that Williams simply relied on the contents of the

police reports for facts and reached his own conclusions from a Title IX

perspective—his testimony is to the contrary. Williams was unequivocal that he

did not read the police reports; he merely "looked at the, what the, what the result

of the [police] investigation was, and that would have determined, you know, for

me that would have been the result of the investigation, what did they conclude."

---

[15] Principal Taylor confirmed that he deferred to Williams and the police to conduct the "investigation," viewing his own role as just to "make the report or reports" to them. Taylor Dep. 51:10–52:24; 68:1–12; 15:1–10.

Williams Dep. 62:14–66:7.[16]  Williams did not review the bodycam video in which

Sanks, apparently lying to the police about not seeking Ms. Doe naked, lawyered

up—since Williams did not even read the police reports, he "didn't know there was

a bodycam." *Id*. In fact, it appears that Williams did not even speak to the SROs

about their investigation. Williams Dep. 57:24–58:5.[17]

The District's "process," as Williams explained and performed it, violates

the Eleventh Circuit's teaching that schools must critically evaluate the facts. It is

not enough to simply "confront[]" the suspect, "obtain[] statements from

complaining students," and be done, because that "would permit future school

districts to satisfy their obligations under Title IX without ever *evaluating* the

---

[16] Derrick Williams's rote acceptance of the police "result" is corroborated by the metadata on his investigation report, which shows no modifications between March 25, 2015 in the 3:00 PM hour—before the police interviewed Sanks—and October 2, 2018. Williams Dep. 55:3–56:8. On March 25, Williams marked the "final resolution" as "inconclusive" as an interim measure while "awaiting on some additional evidence to the, from the police investigation." Williams Dep. 52:3–53:18. According to the metadata, he did not update his report until two-and-a-half years later when he was "cleaning up case files." Williams Dep. 55:3–56:8.

[17] The District cannot argue that Williams (and the other District officials involved in the investigation) could shield themselves from gaining actual notice by refusing to read the police reports or watch the interview tapes. *See Doe v. Sch. Bd. of Miami-Dade Cnty.*, 403 F. Supp. 3d 1241, 1259 n.15 (S.D. Fla. 2019) (recognizing, in the absence of direct Eleventh Circuit guidance, that multiple courts have concluded that willful blindness can satisfy the actual notice standard because it is a volitional act); *S.B. v. Fla. Agric. & Mech. Univ. Bd. of Trs.*, No. 4:16cv613, 2019 U.S. Dist. LEXIS 234719, *25 (N.D. Fla. March 1, 2019) (same); *Doe v. G-Star*, 2017 U.S. Dist. LEXIS 74235, at *30 (S.D. Fla. May 16, 2017) (finding a triable issue on deliberate indifference based on "certain inactions" by a school in failing to follow up on investigative leads); *Forest Hills*, 2015 U.S. Dist. LEXIS 175321, *34 (districts "cannot conduct a sub-par investigation" and then disclaim actual knowledge of things they chose to ignore).

known circumstances at all." *Broward Cnty.*, 604 F.3d at 1263 (emphasis added).

Instead, districts must make a sober judgment about the "known circumstances"

and "must respond in a manner that is not clearly unreasonable" in light of what

they know. *Id*. Williams's testimony, by contrast, supports an inference that he did

not think—that he simply checked a box.

One explanation for Williams's obedience to the criminal process is that he

did not consider himself to be conducting a Title IX investigation in compliance

with Title IX standards. Williams Dep. 53:24–55:2 (explaining why he did not

classify the incident as a Title IX incident and testifying, in response to a question

about whether he considered himself to be conducting a Title IX investigation, that

he "can't really say what I thought in that particular time"). Al Taylor's testimony

reinforces the District's indifference to treating this as a potential Title IX incident:

"This right here was just an employee investigation," not a Title IX investigation.

Al Taylor Dep. 140:19–141:4; *accord id.* at 92:24–100:4 (testifying that he never

considered this a Title IX matter).

Another facet the jury could consider is that the District "failed to ensure

that" Williams and the other officials involved "received training in handling

reports of sex abuse," which "could be viewed by a reasonable juror as evidence

that the District does not take such allegations with the seriousness [they]

deserve"—*i.e.*, as deliberate indifference. *Doe v. Manor Coll.*, 479 F. Supp. 3d

151, 167 (E.D. Pa. 2020) (citing *G.C. v. N. Clackamas Sch. Dist.*, 654 F. Supp. 2d

1226, 1238–39 (D. Or. 2009)). As of 2015, Williams was "aware of Title IX, but as

far as like any in-depth training, I can't say that that happened in 2015, I'm not

sure." Williams Dep. 16:17–1. Nor had the District given him specific training on

Title IX investigations: "Q. So as of March 2015, had the district given you any

training, in your role as an HR director, about how you might conduct a Title IX

investigation? A. I can't call if that was done in 2015, or not, or as of 2015."

Williams Dep. 17:12–18. Did the District give Williams training in the behavior of

sexual predators? "I can't recall that." Williams Dep. 22:11–17. Training in the

behavior of sexual abuse victims? "I can't recall that, either, no." Williams Dep.

22:18–21. Williams could not recall whether Berkmar High School even had a

Title IX coordinator—despite the District's nominal policy that Title IX

coordinators must be made aware of potential Title IX violations. Williams Dep.

48:11–20. And Principal Taylor could not recall any training guidance beyond

"making the reports" to untrained people like Williams. Taylor Dep. 17:16–21.[18]

---

[18] The District cannot undo that testimony with overly broad references to the generic sex discrimination training it gave all employees once a year, which consisted primarily of a brief video on multiple topics, not the specifics that employees like Williams needed to responsibly deal with Title IX issues. Dr. Nan Stein Report at 32–38.

The District's brief barely touches on the substance of the investigation and does not engage with Williams's testimony. In fact, the District frames the outcome as what "GCSD determined" and what "GCSD concluded" [Doc. 86-29 at 2; 27], obscuring the distinction between police officers who happened to be employed by GCSD conducting a criminal investigation and the investigation that the District should have been conducting pursuant to Title IX. The District's statement that "Williams determined that based upon a preponderance of the evidence, the evidence was inconclusive to support a violation of any standards of the code of ethics," [Doc. 86-2 ¶ 79], is unsupported by the Williams testimony the District cites and contrary to the testimony the District disregards. Based on Williams's testimony, it would be difficult for a jury to reasonably conclude he did anything *other* than just rely on the bare outcome of the criminal investigation

Taking Derrick Williams's repeated testimony at face value, a jury could find that he deferred entirely to law enforcement with respect to the outcome of the "investigation" because of District policy and lack of training otherwise. That is deliberate indifference.

### iii.   A jury could find deliberate indifference in the District's failure to offer supportive measures to Ms. Doe and inform her of her rights.

A jury could find that, by the time Sanks invoked the Fifth Amendment, District officials were staring at a number of red flags. And yet the District thereafter kept Ms. Doe and her mother in the dark—alone and unsupported, without any guidance on how to handle the situation.[19] A jury could find that the District's response was clearly unreasonable, even taking at face value the suspect claim that the evidence was "inconclusive."

### 1.   The District failed to offer Ms. Doe any protective or supportive measures during or following the investigation.

Because "inconclusive investigations are common, especially when alleged harassment occurs behind closed doors," school districts cannot simply deem an investigation inconclusive and wash their hands of the matter. *Broward Cnty.*, 604 F.3d at 1261 (it is not "determinative of the School Board's liability that the results of the . . . investigations were ultimately inconclusive"). Nor is it enough to

---

[19] The courts and the Department of Education use terms like supportive measures, accommodations, and corrective measures to describe steps that are directed toward ensuring the safety of putative victims so that they can maintain equal access to school. *See, e.g.*, Spraggs Dep. 35:8–36:5.

"simply do something." *Id*. Instead, Districts must deal seriously with the "known circumstances," ambiguities and all. *Id*.

Thus, "in granting summary judgment for a school district in [the Eleventh Circuit's] prior decisions, the [court] ha[s] repeatedly recognized that a school district's reasonable response to sexual harassment may include corrective action such as monitoring and admonishing an accused teacher or student despite the inconclusive nature of the school's investigation into the misconduct." *Id*. at 1262. By contrast, courts have found triable deliberate indifference where, after a report of possible misconduct, the school failed to separate the suspected assailant from the victim. *E.g.*, *Manor Coll.*, 479 F. Supp. 3d at 164–165 (collecting cases).

This District, by contrast, did nothing designed to guard against the possibility (if not the objective likelihood) that Sanks was a risk to Ms. Doe.[20] The District invited Sanks to come back to school at the conclusion of the investigation, and instructed him not to be "so personable with students," but no one at the

---

[20] There is evidence from which a jury could conclude that District officials remained concerned about Sanks after they brought him back to school on April 3, 2015. *See* Taylor Dep. 85:13–86 (testifying about AP Finnegan's difficulty handling the "Sanks question" about whether Ms. Doe could be around Sanks upon his return). Further, the forensic review of his computer was still underway weeks later, as of April 23, 2015. *See* GCSD-032507 (Taylor emailing Williams on April 23, 2015 about the status of the "investigation" into "Sanks [sic] Computer."). Williams testified that under District policy, he could not or would not even *ask* to review Sanks's phone because that was the employee's private property—regardless of any evidence the phone might contain about the student-victim. Williams Dep. 45:3–46:14.

31

District told him not to have contact with Ms. Doe. Sanks Dep. 41:25–43:4; Taylor Dep. 61:1–4. The District took no steps to separate Sanks from Ms. Doe—although it moved Sanks out of his private office since he was no longer the head football coach, Ms. Doe was able to see him unimpeded and privately on his first day back at school. Doe Dec. ¶ 15; Doe Dep. 80:13–16; *see also* Taylor Dep. 65:19–22, 77:22–79:9 (testifying that the removal of Sanks from the private coach's office "wasn't to keep Sanks away from Ms. Doe," and was simply a result of his resignation of the head coach's position, which itself was not related to his behavior with Ms. Doe). The District took no steps to monitor Sanks's behavior once he returned to school to confirm that he was not abusing Ms. Doe. *See id.*

Undeterred and apparently immune, Sanks continued having sex with Ms. Doe. Doe Dep. 127:21-128:7 (Sanks "play[ed] It safe until he's out of dark water" during the investigation and then continued to sexually abuse her while she was a student). Based on the evidence, a jury could conclude that the District was deliberately indifferent to the need to take reasonable steps to support Ms. Doe, monitor Sanks, keep him away from Ms. Doe, and let him know that he would be caught and face consequences if he were having an inappropriate relationship with her. The jury could likewise find that the District's failures caused Sanks to continue having sex with Ms. Doe. *See Broward Cnty.*, 604 F.3d at 1262 (easily

concluding that a victim "sufficiently alleged causation" when teacher, who received little discipline after prior concerns, assaulted a student).

The District also failed to respond to Ms. Doe's request for support when students began attacking her for her connection to the absence of the popular football coach—additional evidence of deliberate indifference. *See Stinson*, 824 F. App'x at 860 (criticizing district officials who did nothing when students gossiped about a rape victim). As this Court ruled in another case against the District, a "refus[al] to remediate the hostile environment [a victim] report[s]" in turn subjects the victim "to further harassment" in school. *Doe v. Gwinnett Cnty. Pub. Schs.*, 2019 U.S. Dist. LEXIS 238339, *22–23 (finding plausible deliberate indifference where, after a report of sexual abuse, "[o]ther students allegedly called [the victim] names such as whore, slut, liar, and psycho" and the District failed to intervene) (cleaned up). The District's Title IX coordinator and corporate representative rightly acknowledged Title IX required intervention. Spraggs Dep. 34:8–36:5.

In the wake of the District's "investigation," Ms. Doe was victimized again. The day before the District brought Sanks back, Principal Taylor's deputy, Martha Finnegan, brought to his attention concerns from Ms. Doe's mother:



GCSD-038096.[21]

At her deposition, Ms. Doe elaborated: "a whole bunch of different type of derogatory terms [were] being sent my way, from the H word [hoe], the S word [slut], the – you know, I forgot the term for a woman who breaks up a marriage . . . . You know, and none of the – the hurt or the bad was sent [Sanks's] way. It was all my fault in the eyes of my student body or fellow peers. Teachers were looking

---

[21] Given the email from AP Finnegan to Principal Taylor, the District cannot seriously deny having actual notice of this problem. At deposition, Principal Taylor seemed uneasy about his direction to "assume we are being recorded"; a jury could perceive some hostility toward Ms. Doe and her mother in that statement. Taylor Dep. 83:7–85:12.

at me different. It was – it was difficult to just move around like within the school." Doe Dep. 80:7–81:23; Holmes Dec. ¶¶ 14-15; Powell Dec. ¶¶ 16-17.[22]

So what did Principal Taylor do to protect Ms. Doe from being called the slut who hurt the popular Sanks? The evidence shows nothing. Taylor Dep. 87:24–88:19 (claiming he directed follow-up but admitting he had no recollection of what that entailed or whether it happened). Ms. Doe confirms that the "follow-up" never happened. Doe Dec. ¶ 18; Johnson Dec. ¶¶ 17-19. The absence of care is corroborated by the affidavits of Ms. Finnegan and Ms. Walter, which seek to carry a lot of water but are silent as to any follow-up. [Doc. 86-13; Doc. 86-14].

Supposedly, Principal Taylor was also going to have a "meeting" with Ms. Doe's mother about helping Ms. Doe, but he says it was "canceled"—he is not sure by whom—and he never followed up to ensure it happened. Al Taylor Dep. 86:9–15. The meeting, if there even was one planned, did not happen. Johnson Dec. ¶ 12 (also testifying she did not cancel the meeting). No one from the District ever checked in to make sure Ms. Doe was safe and okay following the investigation—

---

[22] This abuse straddles the line between teacher-on-student and student-on-student abuse because it was an outgrowth of teacher-on-student abuse and the District's handling of it; in other words, District employees were key players in the origin of the abuse. But the abuse also satisfies the more rigorous student-on-student standard because it was "so severe, pervasive, and objectively offensive that it effectively bar[red Ms. Doe's] access to an educational opportunity or benefit." *Williams v. Bd. of Regents*, 477 F.3d 1282, 1293 (11th Cir. 2007) (quoting *Davis*). Ms. Doe testified that the embarrassment ruined the rest of her senior year and led her, in part, to run away from Atlanta for college. Doe Dep. 88:2–89:3.

further evidence from which a jury could find deliberate indifference. Johnson Dec. ¶ 13; Doe Dec. ¶ 18; *e.g.*, *Fairfax Cty.*, 1 F.4th at 272-73 (a jury could find deliberate indifference where, among other things, the District "neglected to take even the minimal step of checking in on Doe to make sure she was okay").

From the cumulative behavior and testimony of Taylor and Williams, a jury could conclude that District policy required something akin to eyewitness or photographic evidence of abuse before the District would offer the protections of Title IX to Ms. Doe, which is "nonsensical" and flatly contrary to law. *Fairfax Cnty.*, 1 F.4th at 267–68; *Broward Cnty.*, 604 F.3d at 1261 (schools must respond even when the facts are "inconclusive" because the abuse "occurs behind closed doors"); *Forest Hills*, 2015 U.S. Dist. LEXIS 175321, *34 (criticizing "the tenor of the required proof the district seemed to require," which was "nothing short of a signed confession or video tape of the alleged assault").

A reasonable jury could conclude that Principal Taylor and his deputies did nothing in response to Ms. Doe's cry for help, which is deliberate indifference.

### 2.  The District never informed Ms. Doe of her Title IX rights.

Ms. Doe and her mother had no awareness that she could be entitled to supportive measures pending and following the investigation into Sanks because the District never informed them that she had any rights under Title IX, which is

36

evidence of deliberate indifference. A "failure to advise [a student] of her Title IX rights" can (self-evidently) constitute deliberate indifference to those rights. *Stinson v. Maye*, 824 F. App'x 849, 860 (11th Cir. 2020). The District's Title IX Coordinator and 30(b)(6) witness echoed that District officials need to tell students "what their rights are" so that students can exercise them. Spraggs Dep. 40:2–42:1; Spraggs Dep. Ex. 7 at GCSD-033998 (similar in a District internal presentation).

It is not disputed that the District failed to inform Ms. Doe of her Title IX rights, or even that she would be protected if a teacher were sexually abusing her and she needed help. Doe Dec. ¶¶ 11, 24; Penn Dep. 26:5–27:6. Despite nominally leading the investigation, Derrick Williams did not view it as his "role to interact with the student, and make sure that she was aware of any rights she might have had under Title IX." Williams Dep. 51:19–23. No one from the District ever informed Ms. Doe or her mother that the District had concluded that it was "inconclusive" whether Sanks had sexually abused Ms. Doe. Doe Dec. ¶ 25; Johnson Dec. ¶ 14. Principal Taylor justified keeping the outcome of the investigation from Ms. Doe because "[t]his right here was just an employee investigation," and unlike the "process for a Title IX investigation," there was no "process that we would share what happens with an employee." Al Taylor Dep.

140:19–141:4. Since Sanks returned to school and was allowed to see Ms. Doe, they understood he had been cleared. Doe Dep. 83:13–21; Johnson Dec. ¶ 15.

If she had been informed of Ms. Doe's Title IX rights and that the school suspected that Sanks was abusing Ms. Doe, Ms. Doe's mother would have requested assistance from the school to protect her daughter from Sanks. Johnson Dec. ¶ 9. But the District willfully failed there too.

### 3. The District misled Ms. Doe about her legal status as a potential crime victim.

A jury could also find deliberate indifference because the District misled Ms. Doe and her mother about Ms. Doe's legal rights as a potential crime victim, which had the effect of dissuading them from pursuing criminal action against Sanks. SRO Penn told Ms. Doe and her mother that it was not a crime for Sanks to have sex with Ms. Doe, so long as she didn't physically resist, leaving Ms. Doe and her mother to believe that Ms. Doe had no criminal rights. Doe Interview 35:21–37:11; Johnson Dec. ¶¶ 10-11; Doe Dec. ¶ 11. And since the District never informed Ms. Doe or her mother of the information gathered during the investigation, they believed Sanks had been cleared of any wrongdoing, including potential crimes. Doe Dep. 83:13–21; Johnson Dec. ¶¶ 14-15. Had she known the evidence that the SROs collected that strongly suggested that Sanks had sexually

abused Ms. Doe, her mother would have pursued a further criminal investigation and taken additional steps to protect her child. Johnson Dec. ¶ 11.

The District continued to hide the truth from Ms. Doe even when she asked. When the District later contacted her in connection with another legal case where a District teacher was accused of sexually abusing students, Ms. Doe began to wonder whether what Sanks had done to her was also a legal violation.  Doe Dec. ¶ 23. She requested from the District a copy of the police report concerning the investigation into whether she had been sexually abused as a child by Sanks. *Id*. at ¶ 26. The District's representatives refused to provide it to her, even though they represented to her that they had a copy in their possession. *Id*. Instead, the District told her she had to go to the Gwinnett County Police Department to request a copy in person. *Id*.  When she did so, she was told that they did not have a copy of the report because it was a school police report, which was humiliating. *Id*. The District refused her renewed request to provide her with a copy of the police report and told her that if she wanted a copy, she would have to serve a formal discovery request in this case. *Id*. ¶ 27. She waited over three months to finally get a copy of the report that had been prepared about her abuse five years prior. *Id*.

A reasonable jury could find evidence of deliberate indifference from the District's provision of misleading information to Ms. Doe and her mother about

whether Ms. Doe might have legal rights as a crime victim and its failure to

provide Ms. Doe or her mother with information about the troubling evidence

uncovered in the police investigation. *Fairfax Cnty.*, 1 F.4th at 271–72 (a jury

could infer deliberate indifference when school officials tried to "dissuade [the

student] from taking legal action").

## Conclusion

When the District declined to support and protect Ms. Doe from an obvious

predator, the obvious happened: he kept abusing her. A jury could find the

District's conduct was clearly unreasonable.

By contrast, a ruling in the District's favor would establish—as a matter of

law—that high-level school officials can willfully disregard admittedly concerning

evidence that a teacher is having sex with a student, conceal from the student her

rights and the outcome of the investigation, and wash their hands of the affair even

when they learn that the student is being harassed for being a "slut." That view of

the law would contradict the governing precedents because it would contradict the

very purpose of Title IX. The Court should decline the District's invitation to

weaken Title IX, and should instead let a jury weigh the evidence.